UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTHONY HOUSE,

                                    Plaintiff,

            -v-

CITY OF NEW YORK, et al.,

                                    Defendants.

18 Civ. 6693 (PAE) (KNF)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

This case involves claims under 42 U.S.C. § 1983 by a pretrial detainee that his jailers violated his due process rights under the Fourteenth Amendment when they failed to protect him against a December 2017 assault. Plaintiff Anthony House brings § 1983 claims against the City of New York and New York City Department of Correction ("DOC" and, together, the "City") and Correction Officer Romel Seepaul, Shield # 18686 ("Seepaul"). House also brings state-law claims against the City for negligent hiring and *respondeat superior*. Defendants now move for summary judgment. For the following reasons, the Court grants defendants' motions.

I.      **Background**

        A.      **Factual Background**[1]

                1.      **House's Arrest, Intake, and Housing Conditions**

        On October 13, 2017, House was arrested for criminal contempt in the first degree and assault in the second degree on a peace officer using a weapon. JSF ¶ 1; Defs. 56.1 ¶ 1. After

---

[1] This factual account draws primarily from the parties' submissions in support of and in opposition to the City's and Seepaul's motions for summary judgment, including the parties' Joint Statement of Undisputed Facts, Dkt. 68 ("JSF"), the City's Local Rule 56.1 statement, Dkt. 78 ("Defs. 56.1") (incorporated by reference by defendant Seepaul, *see* Dkt. 86), House's response to defendants' Local Rule 56.1 statement, Dkt. 90 ("Pl. 56.1"), the City's reply to

his arrest, and at all relevant times, House was held at the Vernon C. Bain Correctional Center

("VCBC") in DOC's custody as a pretrial detainee.  JSF ¶ 2; Defs. 56.1 ¶¶ 3, 13, 15.

VCBC is part of DOC's Riker's Island Complex.  JSF ¶ 2.  House was held in housing

area 2BB, a dorm-style complex that does not have cells and, at the time, housed 55 inmates.

Smith Decl., Ex. G ("Defs. Seepaul Tr.") at 12 (excerpt of Seepaul deposition); Pl. 56.1 ¶ 13.  It

is undisputed that at all relevant times, Seepaul was responsible for supervising the housing area

of 2BB.[2]

DOC maintains an Inmate Handbook, which sets out, among other things, the procedures

for filing formal grievances that inmates must use under DOC's Inmate Grievance Resolution

Program ("IGRP").  Defs. 56.1 ¶ 5; Smith Decl., Ex. D ("Inmate Handbook") (excerpt of

handbook).  To file a formal grievance, the inmate must complete the "Inmate Grievance

Interview Slip" or an "Inmate Grievance Form."  Defs. 56.1 ¶ 6.  Either must be submitted

within 10 days of the incident about which the inmate complains.  *Id.* ¶ 7.  Certain complaints are

---

House's Local Rule 56.1 statement, Dkt. 97 ("Defs. Reply 56.1") (incorporated by reference by
defendant Seepaul, *see* Dkt. 99), and the Declarations (some with accompanying exhibits) of
Valerie Smith, Dkt. 79 ("Smith Decl.") and Devon Radlin, Dkt. 88 ("Radlin Decl.").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein.
Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary
evidence and are denied by a conclusory statement by the other party without citation to
conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y.
Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the
statement required to be served by the moving party will be deemed to be admitted for purposes
of the motion unless specifically controverted by a correspondingly numbered paragraph in the
statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the
movant or opponent . . . controverting any statement of material fact[ ] must be followed by
citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2] The parties dispute the exact period during which Seepaul supervised the 2BB dormitory.  *See*
Pl. 56.1 ¶ 51 (claiming June 2017 to the present); Defs. Reply 56.1 ¶ 51 (claiming June 2017 to
September 25, 2019).

"not grievable" and are not subject to the grievance procedure.  These include (1) "complaints of assault or harassment by a staff person, which the IGRC will refer to the commanding officer for necessary action"; (2) "issues that are in litigation"; and (3) "issues that do not directly affect [the complaining party]."  Inmate Handbook at 1633.  The parties dispute whether a complaint about a correction officer's failure to protect an inmate from an assault by another inmate is subject to the IGRP.  Defs. 56.1 ¶ 10; Pl. 56.1 ¶ 10.

The parties further dispute whether, while in custody, DOC provided House with a copy of the handbook and thus whether he was aware of the IGRP.  Defs. 56.1 ¶ 4; Pl. 56.1 ¶ 4.  The City contends that House received and signed for at least one copy.  *See* Defs. 56.1 ¶ 4; Smith Decl., Ex. C ("Handbook Receipt").  House attests that he did not receive a copy of the handbook upon arrival at VCBC or during his earlier (2005 and 2009) detentions at the Riker's Island complex.  *See* Pl. 56.1 ¶ 4; Radlin Decl., Ex. 1 ("Pl. House Tr.") at 19–20 (excerpt of House deposition testimony).  House further disputes the authenticity and content of the Handbook Receipt.  *See* Dkt. 89 ("House Opp.") at 8.

### 2.    House's Interaction with Officers and Inmates Prior to the December 30, 2017 Assault

House testified that in late November 2017, he had a conversation with another inmate, P.M.,[3] who was also housed in 2BB, which became a verbal altercation.  Pl. House Tr. at 62–67.  The altercation concerned a gang prosecution involving one of P.M.'s friends.  *Id.* at 62.  P.M. did not threaten House.  *Id.* at 64.  House did not report this incident to Seepaul or any other officer.  *Id.*  Between this verbal altercation and the December 30, 2017 assault that forms the basis of his claims, House did not have any further altercations with P.M.  *Id.* at 64–65.

---

[3] The Court identifies non-party inmates by their initials.

House testified that, in early December, about three weeks before the December 30, 2017 assault, he told Seepaul that he did not "feel comfortable" in 2BB and asked to be moved to a different jail or dorm.  Smith Decl., Ex. E ("Defs. House Tr.") at 26; Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35.  The parties dispute whether House told Seepaul that he was worried about being jumped or whether he stated only that he was generally uncomfortable.  *Compare* Defs. 56.1 ¶ 35, *with* House Opp. at 2 (quoting Pl. House Tr. at 26, 45).  Questioned at his deposition whether he had told Seepaul that someone was "after [him]," House responded that he had done so, but that he had not identified that person.  Defs. House Tr. at 167.  However, when asked whether he told Seepaul anything other than that he felt uncomfortable, House said he had not.  *Id.* at 27.  House explained that he had not known, at the time, who might want to jump him.  *Id.* at 45.  House testified that Seepaul said that he would speak to his area supervisor and that Seepaul told House that he, Seepaul, had "a feeling" that he knew who House was talking about.  *Id.* at 26–27.  House further testified that he believed that Seepaul knew that inmates were planning to jump him, and even which inmates were planning to do so, based on the fact that he had heard from other inmates that Seepaul had discussed House's sanitation job with P.M.  *Id.*[4]

Seepaul testified that he did not recall ever having any conversations with House about such subjects prior to December 30, 2017.  Defs. Seepaul Tr. at 31; Dkt. 52-3 ("Supp. Seepaul

---

[4] The record as to when the first threat against House occurred is unclear.  In his brief, House states that his first notice of potential threats against him occurred three weeks before the assault and spurred this discussion with Seepaul.  *See* House Opp. at 14.  But House's testimony put his first discussion with a fellow inmate about a possible attack a week later—two weeks before the incident.  Defs. House. Tr. at 25.  Consequently, the parties dispute whether, three weeks before the incident, House told Seepaul that he was merely feeling unsafe or whether he had heard about threats to his safety.  *Compare* House Opp. at 14, *with* Dkt. 96 ("City Reply") at 6.

Tr.") at 28.[5]  Seepaul did not recall having spoken to House prior to December 30, 2017, and denied that any discussion along these lines occurred, including that he ever told House that he knew who might be a threat to his safety or that he knew there to be an issue between House and P.M.  Supp. Seepaul Tr. at 28–29; Defs. Seepaul Tr. at 51.  Seepaul further denied that any other officer briefed him about House.  Defs. Seepaul Tr. at 46.[6]  He also denied having told House that he would speak to his captain about the situation.  Supp. Seepaul Tr. at 28–29.  Before the December 30, 2017 assault, Seepaul had never witnessed any physical altercations or other aggression between House and P.M. or D.J, another inmate involved in House's assault.  Defs. 56.1 ¶ 38; Pl. 56.1 ¶ 38.

House testified that approximately two weeks before December 30, 2017, he told another officer, identified in the complaint as "John Doe," that he did not "feel comfortable" in 2BB and asked to be moved.  Smith Decl., Defs. House Tr. at 25; Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35.  House testified that "John Doe" responded that he would inform the area captain.  Defs. House Tr. at 25.  House did not testify to having specifically told the John Doe officer that his life or safety had been threatened.  Defs. House Tr. at 25.  "John Doe" has not been identified and there is no corroboration for House's claim to have reached out to "John Doe."

House never requested to be placed into protected custody.  Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35.  Nor did House file an Inmate Grievance Interview Slip or an Inmate Grievance Form.  Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 11.  Before the December 30, 2017 incident, neither DOC nor Seepaul had

---

[5] Although both the City and House cite to excerpts of Seepaul's deposition in their respective briefs, neither party excerpted the cited page.  This page was not taken from the 56.1 statement but from a prior filing on the docket of this case.  The parties do not dispute that this page is a true and correct portion of Seepaul's deposition transcript.

[6] Consistent with this denial, Seepaul did not notify his superior of a request by House to be moved.  Supp. Seepaul Tr. at 28–29.

received any written notice reflecting a threat to House's safety or hostility between House and any inmate (including those involved in the incident: A.R., P.M. and D.J.). JSF ¶¶ 13–15.

### 3. The December 30, 2017 Incident

On December 30, 2017, House remained housed in unit 2BB of VCBC. JSF ¶ 3. Seepaul was one of two officers in charge of supervising inmates in 2BB. *Id.* ¶ 4; Defs. 56.1 ¶ 16; Pl. 56.1 ¶ 16. Seepaul was responsible for the inmate housing area in 2BB, where he was assigned to the correction officer desk. Defs. 56.1 ¶ 17. Officer O'Neil was responsible for supervising 2BB and 2BA, using a monitor situated in a space between the dorms known as "the Bubble." Defs. Seepaul Tr. at 13, 63–64; Pl. 56.1 ¶¶ 16, 18. O'Neil was capable of viewing both monitors simultaneously from that position. Defs. Seepaul Tr. at 64.

House testified that, at lunch on December 30, 2017, another inmate, E.S., advised him to be careful because someone was going to jump him. Pl. House Tr. at 24. House was "not really worried" by E.S.'s statement. *Id.* Nevertheless, House testified that, at about 5:30 p.m. that day, during Seepaul's rounds, House told Seepaul that he did not "feel safe" in 2BB and wanted to be moved. *Id.* at 28, 76. House testified that Seepaul laughed and said, "I don't know." *Id.* at 28. Seepaul testified that he did not remember having any conversation with House on December 30, 2017 and did not notify his captain or the movement officer. *See* Supp. Seepaul Tr. at 28; Defs. Seepaul Tr. at 19.

House testified that, on December 30, 2017, at approximately 9:30 p.m., he had another conversation with E.S. and another unidentified inmate, during which they discussed their criminal cases. Pl. House Tr. at 47. During this discussion, another inmate, A.R., who was in a nearby bed, told House that "people were tired of [House]" and that House "was acting crazy" and should "pack his things" and "get out of here." *Id.* at 47–51; Defs. 56.1 ¶ 19. House testified that he told A.R. that he was waiting for "the officer to do something about it." Pl.

House Tr. at 47.  This escalated into a verbal altercation.  Defs. 56.1 ¶ 19; *see also* Smith Decl.,

Ex. H ("VCBC Video").  House testified that A.R. began to get "aggressive" and began

"punching" his fists together.  Pl. House Tr. at 48.  At this point, however, House did not yet find

A.R. threatening and had the opportunity to walk away but did not do so.  Pl. House Tr. at 48;

Defs. 56.1 ¶ 20.  House testified that A.R. began "coming towards [House] in an aggressive

way," with "his fists bal[led]."  Pl. House Tr. at 51.  House observed at this point that Seepaul

was not at the correction officer desk.  Defs. 56.1 ¶¶ 21–23; Pl. 56.1 ¶¶ 21–23; Defs. House Tr.

at 72.  Seepaul testified that he had left his post for approximately 15 minutes around this time,

to use the bathroom and that he asked Officer O'Neil to "keep an eye on the dorm" from the

Bubble.  Defs. Seepaul Tr. at 32, 53, 55.  Seepaul does not dispute that it was against DOC

policy to leave his post without securing another officer to cover it.  *Id.* at 53–54.

House then punched A.R. in the face.  JSF ¶ 5; VCBC Video; Defs. 56.1 ¶ 23; Pl. 56.1

¶ 23.  House testified that he attacked A.R. before anyone had attacked him to protect himself

because he felt that A.R. was going to jump him, and because Seepaul had abandoned his post.

*See* Pl. 56.1 ¶ 24; Pl. House Tr. at 47–48.  Before this altercation, House had not suspected that

A.R. was going to attack him.  Pl. House Tr. at 52.  The parties dispute whether House's attack

on A.R. is fairly termed a "surprise" attack.  Defs. 56.1 ¶ 25; Pl. 56.1 ¶ 25.

Immediately after House punched A.R., inmates P.M. and D.J. assaulted House from

behind.  JSF ¶¶ 6–7; VCBC Video.  Their assault on House lasted approximately 30 seconds.

VCBC Video; Defs. 56.1 ¶ 27.  Surveillance cameras captured both House's attack on A.R. and

P.M. and D.J.'s ensuing assault of House.  JSF ¶ 8; VCBC Video.

Seepaul had not secured another officer to relieve him before leaving his post for the

bathroom and did not personally see the attacks by House on A.R. or by P.M. and D.J. on House.

Defs. 56.1 ¶¶ 41–43.  O'Neil, monitoring both the 2BB and 2BA housing areas on the monitors in the Bubble, alerted Seepaul that a fight had broken out in 2BB.  Defs. Seepaul Tr. at 33–34. Seepaul then entered the housing area, turned on the lights, and ordered the inmates to stop fighting.  Defs. House Tr. at 59; Defs. Seepaul Tr. at 34, 47–48.  The inmates complied.  Defs. House Tr. at 59; Defs. Seepaul Tr. at 34.  As a result of this altercation House sustained, *inter alia*, a fracture to his right eye socket, a skull fracture, and a nose fracture, necessitating a surgery in 2018.  Pl. House Tr. at 83–86, 92.

Following the incident, House received medical attention.  JSF ¶ 9.  House did not file an Inmate Grievance Interview Slip or an Inmate Grievance Form.  Defs. 56.1 ¶ 12; Pl. 56.1¶ 12.

### 4.    Seepaul's Training and Discipline

Seepaul was trained at the Correction Officers' Academy ("CO Academy").  Defs. 56.1 ¶ 39.  At the CO Academy and on the job, Seepaul was trained to respond to an inmate's reports of threats to his safety, to handle inmate fights, and to not leave his post unattended.  *Id.* Defendants admit that Seepaul was aware that he was not permitted to leave his post unless another officer was available to relieve him.  *Id.* at ¶ 40.  The parties dispute whether Seepaul received training on the IGRP, the inmate grievance resolution program, Pl. 56.1 ¶ 53; Defs. Reply 56.1 ¶ 53, or on protective custody, Pl. 56.1 ¶ 54; Defs. Reply 56.1 ¶ 54.

After the December 30, 2017 incident, DOC investigated Seepaul's actions.  Defs. 56.1 ¶ 45.  Seepaul was charged with and pled guilty to charges of abandonment of post and "efficient performance of duties."  *Id.* ¶ 46; Pl. 56.1 ¶ 46.  As punishment, Seepaul received a command discipline and lost one vacation day.  Def. 56.1 ¶ 46–47; Pl. 56.1 ¶ 46–47.

██████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████

## B.  Procedural History

On July 25, 2018, House filed an initial Complaint.  Dkt. 1.  On October 19, 2018, the City answered.  Dkt. 13.  On December 18, 2018, the Court held an initial pretrial conference and approved the parties' case management plan.  Dkt. 18.  On January 8, 2019, consistent with that plan, House filed an amended complaint, adding Seepaul as a defendant.  Dkt. 21 ("Am. Compl.").  On January 22, 2019, the City answered.  Dkt. 24.  On April 22, 2019, Seepaul filed an answer and a cross-claim against the City for indemnification.  Dkt. 38 ("Seepaul Answer").  On May 14, 2019, the City answered Seepaul's cross-claims.  Dkt. 41 ("City Cross-Claims Answer").

On August 29 and 30, 2019, Seepaul and the City, respectively, filed pre-motion letters in anticipation of motions for summary judgment.  Dkts. 44–45.  On October 11, 2019, House responded to both letters.  Dkt. 50.  On November 12, 2019, the Court held a pre-motion conference to set the briefing schedule for the motions for summary judgment.  *See* Dkt. 67.  On December 6, 2019, the parties filed a Joint Statement of Undisputed Facts.  *See* JSF.  On January 10, 2020, the City filed a motion for summary judgment on House's claims against the City and DOC.  Dkts. 75, 78–80.  On February 3, 2020, Seepaul filed a motion for summary judgment.  Dkts. 84–86.  Seepaul's motion incorporated by reference the Rule 56.1 Statement submitted by the City and the City's arguments, Dkt. 86, and addressed House's conspiracy claim against Seepaul in his individual capacity, Dkt. 85.  On February 14, 2020, House filed an

opposition to both defense motions for summary judgment.  Dkts. 88–90.  On March 2, 2020, the City and Seepaul filed their respective replies.  Dkts. 95–100.[7]

## II.     Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A]

---

[7] While the summary judgment motions were briefed, the parties litigated House's bid to obtain Seepaul's disciplinary records.  On October 15, 2019, House moved to compel production of these records and for discovery sanctions.  Dkts. 51–53.  On October 16, 2020, the Court denied the motion without prejudice, based on House's failure to comply with the Court's individual rules.  Dkt. 55.  On October 17, 2019, House, now compliant with those rules, filed a letter seeking Seepaul's disciplinary file, reopening of discovery, and sanctions against Seepaul. Dkt. 58.  On October 21, 2019, Seepaul replied, arguing that House's motion was belated, and that N.Y. Civil Rights Law ("NYCRL") § 50-a protected his disciplinary record from disclosure. Dkt. 60.  On October 22, 2019, the Court ordered production of Seepaul's disciplinary record, but subject to a protective order to safeguard its confidentiality, and denied House's motion for sanctions.  Dkt. 62.  On October 25, 2019, the Court clarified that records involving similar incidents on Seepaul's part need be produced.  Dkt. 66.

On July 14, 2020, after the repeal of NYCRL § 50-a, the Court ordered the unsealing of any sealed filings related to Seepaul's disciplinary records.  Dkt. 103.  On July 24, 2020, the City moved for reconsideration, Dkt. 110–12, which House opposed, Dkt. 113.  On July 28, 2020, the Court stayed its decision unsealing filings referring to Seepaul's disciplinary history pending the outcome of a separate lawsuit concerning the scope of the repeal of NYCRL § 50-a.  Dkt. 114.

In this decision, as a publicly issued version, the Court has redacted references to Seepaul's disciplinary history, other than that arising from the incident at issue in this case.

party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Discussion

House brings three claims under § 1983, each alleging a violation of his Fourteenth Amendment due process rights: (1) a claim against Seepaul for failure to protect House from assault; (2) a *Monell* claim against the City for failure to protect House from assault; and (3) a claim that Seepaul and the John Doe officer conspired to violate House's constitutional rights. House also brings state law claims against the City, seeking to hold it liable for Seepaul's violations of law under negligent hiring and *respondeat superior* theories.

The Court first examines the City's arguments that the John Doe officer and the DOC are not legally proper defendants.  The Court next considers defendants' argument that House failed to exhaust his administrative remedies.  The Court then examines whether there is sufficient evidence to support each of House's claims.

11

### A.    Proper Defendants

#### 1.    John Doe Officer

The City first moves to dismiss the § 1983 claim against individual defendant John Doe, because House has not been able to identify him.  *See* Dkt. 80 ("City Mem.") at 4.

To sustain a § 1983 action against an individual defendant, a "plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010).  Using "John Doe" in lieu of an individual defendant's name does not adequately identify that person.  *See Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009).  However, "courts typically resist dismissing suits against John Doe defendants 'until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials.'"  *Id.* (quoting *Kearse v. Lincoln Hosp.*, No. 07 Civ. 4730, 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009)); *see also Warren v. Goord*, 476 F. Supp. 2d 407, 413–14 (S.D.N.Y. 2007) (court "will not dismiss the claim against John Doe until plaintiff has had sufficient discovery to name the defendant").

However, "where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, . . . the plaintiff simply cannot continue to maintain a suit against the John Doe defendant."  *Cruz v. City of New York*, 232 F. Supp. 3d 438, 448 (S.D.N.Y. 2017) (*quoting Coward*, 665 F. Supp. 2d at 300). Here, discovery is complete, Dkt. 49 (extending close of fact discovery to October 21, 2019), yet House has neither moved to substitute the name of an individual officer nor indicated that he has learned who that person is.  And House, in opposing the City's summary judgment motion, does not address his claims against the John Doe defendant, or argue that his ability to discover the identity of that defendant has been thwarted.  *Cf. Cruz*, 232 F. Supp. 3d at 448 (dismissing

§ 1983 claims against John Doe defendant where plaintiff had not made efforts to discover true name or defend continued use of "John Doe" in opposition to summary judgment motion).

Accordingly, the Court dismisses the claims against the John Doe defendant.  This ruling is without prejudice to House's right to bring a later separate lawsuit against an identified person for the violations alleged.  *See, e.g.*, *Coward*, 665 F. Supp. 2d at 302 (dismissing John Doe claim without prejudice for failure to obtain, after to discovery, identity).

### 2.  New York City Department of Correction

The City next moves to dismiss the claims against DOC on the grounds that DOC is not a suable entity.  *See* City Mem. at 4–5.  The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."  N.Y. City Charter Ch. 17 § 396.  It is well-established that "where a plaintiff has named the Department of Correction[] as a defendant, he has sued a non-suable entity."  *Adams v. Galletta*, 966 F. Supp. 210, 212 (S.D.N.Y. 1997); *see also Johnson v. Dobry*, 660 F. App'x 69, 72 (2d Cir. 2016) (summary order); *Walker v. City of New York*, 367 F. Supp. 3d 39, 46 n.2 (S.D.N.Y. 2019) (distinguishing DOC, which is non-suable, from the Health and Hospitals Corporation, which by statute is suable).  Accordingly, the City is the proper defendant in this action, not DOC.  The Court accordingly dismisses House's claims against DOC.[8]

---

[8] In any event, House appears to have abandoned his claims against DOC, as he does not address these in his opposition to the City's motion.  *See Jackson v. Fed. Express*, 766 F.3d 189, 195, 197–98 (2d Cir. 2014) (where a party is represented by counsel, "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims").

### B.     Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under . . . Federal law[] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Complete exhaustion of administrative remedies is required. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'").  This exhaustion requirement applies to all federal claims relating to prison life, *id.* at 516, regardless of the relief offered by the administrative process or sought by the prisoner, *Booth v. Churner*, 532 U.S. 731, 740–41 (2001).

The PLRA contains an exception, however, to an inmate's obligation to exhaust administrative remedies:  An inmate must exhaust only those remedies that are available.  *See Ross v. Blake*, 136 S. Ct. 1850, 1853 (2016).  The Supreme Court has identified three circumstances under which an administrative remedy is unavailable to an inmate: (1) when the remedy "operates as a simple dead end"; (2) when the remedy is "so opaque that it becomes, practically speaking, incapable of use," *i.e.*, "no ordinary prisoner could navigate" the process; and (3) "when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation."  *Id.* at 1853–54.  "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements."  *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

Before the Supreme Court's decision in *Ross*, the Second Circuit had suggested that failure to inform an inmate-turned-plaintiff of the grievance procedure could raise a question of material fact as to whether that administrative remedy had been available to him.  *See Ruggiero*

*v. County of Orange*, 467 F.3d 170, 178 (2d Cir. 2006).  Consistent with that guidance, in several cases, courts in this District had found that issues of fact precluded pretrial resolution of the defense of exhaustion.  *See Arnold v. Goetz*, 245 F. Supp. 2d 527, 538 (S.D.N.Y. 2003) (inmate's claims of ignorance of administrative remedy raised question of fact whether the remedy was available); *Burgess v. Garvin*, No. 01 Civ. 10994 (GEL), 2004 WL 527053, at *3 (S.D.N.Y. Mar. 16, 2004) ("Courts have held that remedies are not available where prisoners are not informed of their existence." (citing *Arnold*, 245 F. Supp. 2d at 538)).  Courts in this Circuit, however, have read the 2016 *Ross* decision to "limit[] meaningfully the scope of the availability inquiry" by narrowing the "special circumstances" that can support a finding that a remedy was unavailable.  *See Vidro v. Erfe*, No. 3:18 Civ. 00567 (CSH), 2019 WL 4738896, at *8 (D. Conn. Sept. 26, 2019).  These have held that an inmate's unawareness of an administrative remedy does not make it unavailable unless the inmate was unaware due to "machination, misrepresentation, or intimidation" on the part of prison administrators.  *See id.*; *see also Galberth v. Washington*, No. 14 Civ. 691 (KPF), 2017 WL 3278921, at *11 (S.D.N.Y. July 31, 2017), *aff'd*, 743 F. App'x 479 (2d Cir. 2018) (holding that *Ross* heightened the unavailability showing articulated in *Ruggerio*).

Here, it is undisputed that House did not, at any point, file an Inmate Grievance Interview Slip or an Inmate Grievance Form with respect to his fear of other inmates or, more specifically and relevant here, the assault by P.M. and D.J.  Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 11.  This, the City argues, requires a finding that he has failed to administratively exhaust his claims.  And House, the City argues, was aware of his administrative remedies because he received a copy of the Inmate Handbook, which describes the IGRP, as reflected in a receipt signed by House so indicating.  *See* City Mem. at 5–7; Handbook Receipt.  House, for his part, claims unawareness of the IGRP.  He disputes receiving the handbook, asserting that the Handbook Receipt does not

so establish because the signatures on it, including his, are not dated, witnessed, or verified.  *See* House Opp. at 8; Handbook Receipt; Smith Decl. ¶ 3.  The City responds that even if there is a factual dispute whether House received the handbook, House was otherwise aware of the IGRP. *See Ruggiero*, 467 F.3d at 178 (finding that a factual dispute as to whether the inmate received a copy of the handbook was not material where the inmate was otherwise aware of the grievance procedure).  To this end, the City points to an Inmate Grievance Form, dated November 14, 2017, submitted by House regarding his medical care at Rikers.  *See* Dkt. 95 ("Smith Reply Decl."), Ex. K ("House Grievance Form").

The parties also dispute whether the IGRP remedy applies to inmate-on-inmate assaults. *See* Defs. 56.1 ¶ 10; Pl. 56.1 ¶ 10.  The Inmate Handbook, in describing the grievance process, identifies types of complaints that are "not grievable" and thus not subject to that process: (1) "complaints of assault or harassment by a staff person, which the IGRC will refer to the commanding officer for necessary action"; (2) "issues that are in litigation"; and (3) "issues that do not directly affect [the complaining party]."  Inmate Handbook at 1633.  The City argues that because a correction officer's failure to protect an inmate from an assault by another inmate does not fall within any listed exception, a complaint about such conduct is subject to the IGRP (*i.e.*, it is grievable).  Defs. 56.1 ¶ 10.  House construes the handbook's silence as to the specific circumstance of a correction officer's failure to protect an inmate from assault from an inmate as not clearly making such conduct grievable.

The Court's assessment is that summary judgment is warranted for the City, based on House's failure to exhaust.

On one point in the analysis, House is correct—his claims fall outside the IGRP process. To reach this result, the Court takes judicial notice of the IGRP Directive, N.Y.C. DOC Directive

3376 (effective Sept. 10, 2012) ("IGRP Directive"), which codifies the IGRP procedures.  *See*

*Taylor v. City of New York*, No. 16 Civ. 7857 (NRB), 2018 WL 1737626, at *4 n.5 (S.D.N.Y.

Mar. 27, 2018) (judicial notice of IGRP Directive is "common practice" in this District); *see also*

City Mem. at 6 n.4 (inviting Court to take judicial notice of the IGRP Directive).  The IGRP

Directive sets out species of grievances that are not subject to the IGRP process, including

"allegations of physical or sexual assault or harassment by either staff or inmates[.]"  IGRP

Directive § IV(B)(2)(b).  Interpreting this section of the IGRP Directive, courts in this Circuit

have "held that claims involving a correctional officer's failure to protect an inmate from another

inmate's attack falls within that IGRP process exception."  *Alicea v. City of New York*,

No. 16 Civ. 7347 (LAP), 2020 WL 1528478, at *3 (S.D.N.Y. Mar. 31, 2020); *see Taylor v. Swift*,

21 F. Supp. 3d 237, 241–44 (E.D.N.Y. 2014) (claim that "prison officials stood idly by" while

inmate was assaulted by another inmate not subject the IGRP).[9]  And the IGRP directive, rather

than the PLRA, governs whether an inmate has properly exhausted all administrative remedies.

*See Jones v. Bock*, 549 U.S. 199, 218 (2007).  On the basis of this authority, the Court holds that

claims such as House's—that a correctional officer failed to protect an inmate from another

inmate's attack—falls within that exception.  House therefore was not required to exhaust the

entire IGRP process.[10]  *See Alicea*, 2020 WL 1528478, at *3.

---

[9] The court in *Swift* interpreted an earlier version of the IGRP directive, subject to which "allegations of assault or harassment by either staff or inmates" were "non-grievable" under the IGRP process.  *See* N.Y.C. DOC Directive 3375R-A § II(C)(2) (effective Mar. 13, 2008).

[10] In support of their claim that failure-to-protect claims based on inmate-on-inmate assaults are subject to the entire IGRP, the City cites *Cicio v. Wenderlich*, 714 F. App'x 96 (2d Cir. 2018) (summary order).  But in that case, a *pro se* appeal, the text of the IGRP Directive was not before the Second Circuit.  The City also cites *Jhagroo v. Cart*y, No. 17 Civ. 416 (PKC) (SJB), 2019 WL 1922287 (E.D.N.Y. Apr. 29, 2019).  But *Jhagroo*, in examining the procedure as

That, however, does not ultimately carry the day for House because, even when the exception applies and the full suite of IGRP procedures are not required, an inmate must still file a formal grievance to exhaust all remedies. *Id.* (even "when an IGRP exception applies, the inmate must still file a grievance to satisfy his exhaustion requirement, though he need not go through the rest of the IGRP processes."). It is undisputed that House did not file a formal grievance. Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 11. And House does not claim that prison officials attempted to thwart his knowledge of the grievance process. *See Ross*, 136 S. Ct. at 1854; *Vidro*, 2019 WL 4738896, at *8. Thus, even if House did not receive a copy of the Inmate Handbook— and his objection that no date appears along his signature on the Handbook Receipt falls well short of refuting the evidence of such receipt—the IGRP was still available to him, because he not adduced evidence that prison officials attempted to use "machination, misrepresentation, or intimidation" to deny him access to the handbook or to the prison remedial processes that it describes. Moreover, even treating it as factually disputed whether House actually received the Inmate Handbook, there is independent evidence that House was aware of the IGRP process and how to complete and submit an Inmate Grievance Form. He did so on November 15, 2017, just a month before the assault. *See* House Grievance Form; *see also Ruggiero v*, 467 F.3d at 178 (whether plaintiff received inmate handbook not a material fact where he was otherwise aware of the grievance procedures).

---

outlined in the IGRP Directive, did not consider whether any exceptions in § IV(B)(2)(b) applied to a correction officer's failure to protect an inmate from assault. *Id.* at *2.

Accordingly, summary judgment is properly granted on all claims against the City, based on House's failure to exhaust administrative remedies.[11]  *Truss v. City of New York*, No. 18 Civ. 6353 (GHW), 2019 WL 2435623, at *3 (S.D.N.Y. June 11, 2019) (dismissing inmate-plaintiff's claims for failure to exhaust administrative remedies); *Lowman v. Baird*, No. 16 Civ. 6518 (VSB), 2017 WL 6403519, at *4–7 (S.D.N.Y. Dec. 14, 2017) (same); *Prescott v. Annetts*, No. 09 Civ. 4435 (CM), 2010 WL 3020023, at *7 (S.D.N.Y. July 22, 2010) (same).

### C.    Section 1983 Claims

House brings three § 1983 claims: (1) against Seepaul, for failure to protect House; (2) a *Monell* claim against the City based on Seepaul's failure to protect House; (3) against Seepaul and the John Doe officer, for conspiracy to deprive House of his right to be free of unconstitutional conditions of confinement, namely, from the "unlawful and illegal assault of his person by other inmates."  Am. Compl. ¶¶ 23–32.  For the reasons noted, summary judgment is properly granted to the City on the *Monell* claim because House has not exhausted his administrative remedies.  In any event, for the following reasons, summary judgment is properly granted to the defense on each of House's claims because, viewing the disputed facts in the light most favorable to House, the evidence adduced would not entitle him to relief.

### 1.    Legal Standards Governing § 1983 Claims

Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law.  42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws

---

[11] This ruling does not extend to House's claims against Seepaul.  Failure to exhaust administrative remedies is an affirmative defense to a § 1983 claim.  *Jones*, 549 U.S. at 216; *see also Johnson v. Testman*, 380 F.3d 691, 696 (2d Cir. 2004) (defendant can waive affirmative defense of plaintiff's failure to exhaust administrative remedies by failing to raise it in answer).  Unlike the City, Seepaul did not raise exhaustion as an affirmative defense in his answer.  Nor did he later move to amend his answer to include exhaustion.

of the United States (2) by a person acting under the color of state law.  *West v. Atkins*, 487 U.S.

42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978).

a.      *Personal Liability Under § 1983*

To establish personal liability under § 1983, a plaintiff must show that the defendant was

"personally or directly involved in the violation," *Simpson v. Town of Warwick Police Dep't*,

159 F. Supp. 3d 419, 431 (S.D.N.Y. 2016) (quoting *Harris v. Westchester Cnty. Dep't of Corr.*,

No. 06 Civ. 2011 (RJS), 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008)), that is, that there was

"personal participation by one who has knowledge of the facts that rendered the conduct illegal,"

*Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001); *accord Farrell v. Burke*,

449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages under

§ 1983." (internal quotation marks and citation omitted)).

b.      *Municipal Liability Under § 1983*

Municipal liability in a § 1983 action may not be based on *respondeat superior* or

vicarious liability.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Instead, to hold a

municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff

must prove that there was a municipal policy or custom that directly caused the plaintiff to be

subjected to a constitutional violation.  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007);

*see Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("[C]onstitutional

torts committed by city employees without official sanction or authority do not typically

implicate the municipality in the deprivation of constitutional rights, and therefore the employer-

employee relationship is in itself insufficient to establish the necessary causation." (internal

quotation marks and citation omitted)).

A plaintiff can establish the existence of a policy or custom by demonstrating:

(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted) (collecting cases); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 611–12, No. 14 Civ. 1082 (PAE), 2015 WL 5802843, at *14 (S.D.N.Y. Oct. 5, 2015), *reconsideration in part granted on other grounds*, 2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015); *Spears v. City of New York*, No. 10 Civ. 3461 (JG), 2012 WL 4793541, at *11 (E.D.N.Y. Oct. 9, 2012).

### 2.    **House's Failure-to-Protect Claims**[12]

House was a pretrial detainee, and thus his "claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).[13]  That is because pretrial detainees have not been convicted of a crime, and therefore "may not be punished in any manner—neither cruelly and unusually nor otherwise." *Id.* (internal quotations and citations omitted).

"The Constitution imposes a duty on prison officials to 'take reasonable measures to guarantee the safety of the inmates.'" *Luckey v. Jonas*, No. 18 Civ. 8103 (AT) (KNF), 2019 WL 4194297, at *3 (S.D.N.Y. Sept. 4, 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Prison officials have a particular duty to protect other inmates from "violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833.

---

[12] Seepaul adopts the City's arguments on these claims.  *See* Dkt. 85 ("Seepaul Mem.") at 1.

[13] The City and House agree on this point.  *See* City Mem. at 8; House Opp. at 10.

However, not every injury sustained in an inmate-on-inmate assault "translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Rather, a prison official's failure to protect a pretrial detainee rises to the level of a Fourteenth Amendment violation only "where the officer acted with 'deliberate indifference to a substantial risk of serious harm to an inmate.'" *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359–60 (S.D.N.Y. 2009) (quoting *Farmer*, 511 U.S. at 828). "[M]ere negligence" is not sufficient. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996).

The Second Circuit has identified two showings an inmate must make to establish a claim for deliberate indifference to unconstitutional conditions of confinement:  A pretrial detainee must satisfy (1) "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process"; and (2) a "*mens rea* prong" that shows "that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29.  Courts in this District have held that this "*Darnell* framework" applies to failure-to-protect claims.  *See, e.g.*, *Brown v. Warden NYCDOC MDC*, No. 20 Civ. 2144 (LLS), 2020 WL 1911186, at *3 n.3 (S.D.N.Y. Apr. 17, 2020); *Luckey*, 2019 WL 4194297, at *3; *Taylor*, 2018 WL 1737626, at *12.

### a.   Personal Liability of Seepaul

The City does not appear to challenge either that, in leaving his post, Seepaul was acting under the color of state law, or that Seepaul was personally involved in the events giving rise to House's injuries.  Rather, the City argues that there is no underlying constitutional violation because the evidence cannot establish (1) that House was subject to conditions sufficiently serious to satisfy the objective prong, and (2) that Seepaul acted with the deliberate indifference required by the subjective prong.  City Mem. at 9–13; City Reply at 4–8.

       i.      Objective Prong: Substantial Risk of Serious Harm

Under the Due Process Clause, there is no "static test" as to whether the evidence establishes sufficiently serious conditions to satisfy the "objective prong." *Darnell*, 849 F.3d at 30. A prison official's failure to "intervene in an attack . . . may under certain circumstances create a condition which poses a substantial risk of serious harm thus constituting a sufficiently serious constitutional violation." *Molina v. County of Westchester*, No. 16 Civ. 3421 (VB), 2017 WL 1609021, at *3 (S.D.N.Y. Apr. 28, 2017); *see also Luckey*, 2019 WL 4194297, at *4. In evaluating whether the risk of an inmate being harmed by another inmate is "'sufficiently serious,' to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.'" *Blake v. Kelly*, No. 12 Civ. 7245 (ER), 2014 WL 4230889, at *5 (S.D.N.Y. Aug. 26, 2014) (quoting *Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997)). A previous altercation may support the factual finding of a substantial risk of serious harm, but there is no requirement of a prior altercation. *Luckey*, 2019 WL 4194297, at *4.

House emphasizes that a plaintiff may fulfill the objective prong by demonstrating a "generalized risk" of harm in the prison facility. *See Ross v. City of New York*, No. 12 Civ. 8545 (LGS), 2014 WL 3844783, at *5 (S.D.N.Y. Aug. 4, 2014), *rev'd and remanded on other grounds*, No. 14-3327 (2d Cir. July 20, 2015); *see also* House Opp. at 11. But House has not adduced such evidence here. He has not identified any evidence that VCBC or the 2BB dorm were particularly violent such that leaving an inmate unsupervised for any period of time could pose a substantial risk of serious harm to an inmate. House notes that DOC's policy required Seepaul to secure coverage before leaving his post to demonstrate a generalized risk. House Opp. at 11. But that policy was of general application. House does not point to evidence supporting any factor that courts have found probative in finding that a dorm or other prison

facility presented a generalized risk of substantial harm to all inmates, *e.g.*, that it was a "maximum security cell block," "known to be populated by gang members," a place in which inmates "tend to flight whenever they feel like it," or one in which prisoner cells had not been searched for weapons. *Ross*, 2014 WL 3844783, at *4.

Lacking such evidence, to establish the objective prong, House must adduce evidence that there was a particularized, substantial risk of serious harm to himself. To this end, House first asserts in his brief that, according to his deposition testimony, he had heard from inmates, shortly after his verbal altercation with P.M., about threats to his life and safety, and that he had communicated these threats to Seepaul. *See* House Opp. at 2, 12, 14. That, however, overstates House's deposition testimony.[14] House testified to having had a verbal argument with P.M. in late November 2017. Pl. House Tr. at 62–67. But he testified that P.M. did not threaten him during this altercation and that he had not reported the argument to Seepaul. *Id.* at 64. House also states in his brief that "[s]hortly after this argument, [House] began to hear threats to watch himself from fellow inmates." House Opp. at 2. Questioned in his deposition on this point, House identified two such instances: (1) about two weeks before the incident, House heard that someone was going to jump him; and (2) on December 30, 2017, E.S. told him to "be careful" because someone was going to jump him. Defs. House Tr. at 24–25, 45.

The parties debate the extent of Seepaul's knowledge of the threats. Although relevant to the *mens rea* rather than the objective prong, House, even viewing the evidence in the light most favorable to him, did not convey these facts to Seepaul. House testified that he had the first

---

[14] House's brief repeatedly states that threats had been made on his life. House Opp. at 2, 12, 14–15. But he does not point to any admissible evidence to this effect, including any aspect of his deposition testimony recounting threats on his life, let alone that he communicated threats of this nature to Seepaul.

relevant conversation about such matters with Seepaul approximately three weeks before the

December 30, 2017 incident.  At that time, he told Seepaul that he was "uncomfortable" and that

someone was "after [him]," in response to which, House testified, Seepaul replied that he had "a

feeling" about who House was referring to.  Defs. House Tr. at 26–27, 167.  House's testimony

places that discussion before House first heard that someone was going to jump him.[15]  And he

did not anywhere testify that he had explicitly told Seepaul that he feared that someone would to

"jump" him.  *Compare* Defs. House Tr. at 26 (House testifying that he told Seepaul he did not

"feel comfortable" in 2BB and asked to be moved), *with id.* at 167 (House testifying, in response

to a question as to whether he told Seepaul someone was "after" him, that he did so).  The

second occurred at approximately 5:30 pm on December 30, 2017, wherein, during Seepaul's

rounds, House told Seepaul that he did not "feel safe" in 2BB and wanted to be moved.  Pl.

House Tr. at 28, 76.  House did not attest to any other conversations with Seepaul.  It was the

John Doe officer to whom House testified he spoke after he had been told by an unidentified

inmate, two weeks before the December 30, 2017, that he might be jumped.  Defs. House Tr. at

25.

   In all events, the question as to the objective prong is whether the two, or possibly three,

statements made to House, taken in aggregate with House's injuries, would permit a reasonable

jury to find that a substantial risk of serious injury to himself existed prior to the attack.  Both

statements were unspecific.  As to the first statement, made two weeks before December 30,

2017, House testified only that he heard that someone was going to jump him.  Def. House Tr. at

25.  He did not identify the person who related the potential threat to him, the identity of the

---

[15] As noted, the record is unclear as to whether the first instance in which House heard of a
possible threat against him was approximately three, or two, weeks before the assault.  *See supra*
p. 4 n.4.

potential attacker(s), or the reasons for the attack, and he was not told that an attack was imminent. *Id.* House told the John Doe officer that he was "uncomfortable" and wanted to be moved but did not say that he feared for his life or safety or that he had been threatened. *Id.* House's conversation with E.S. was slightly more pointed in that E.S. told House to "watch his back" because someone was going to jump him. *Id.* at 24. But the conversation contained no more detail, and House himself testified that he "was not really worried about it" at the time, telling Seepaul during his rounds that evening only that he did not feel comfortable in 2BB. *Id.* at 24, 28. And while House testified to having made at least two requests to be moved, *see* Defs. House Tr. at 25–26, he did not request protective custody, *see* Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35.

These circumstances present a close question. In the Court's assessment, a reasonable jury, crediting House's account, could find either way on whether a substantially serious risk of harm to House existed. But on the City's summary judgment motion, that requires sustaining House's claim, as to the objective prong, because House is the non-moving party. In particular, House has adduced admissible evidence of two unspecific but still consequential verbal threats to his safety, two instances in which he requested to be relocated, and a verbal altercation with P.M., one of his eventual assailants. Crediting his testimony, House had told Seepaul that someone was "after [him]," Defs. House Tr. at 167, indicating that, in real time, he perceived a true risk to himself. To be sure, the parties debate at length the extent of Seepaul's knowledge of the threats and the reasonableness of his actions. *See* House Opp. at 12–15; City Reply at 5–7. But those questions bear on the subjective prong of the analysis. While a reasonable juror could find against House on the objective prong even crediting his account in full, such a juror could also find that, in the period immediately before the December 30, 2017 attack, House faced a substantially serious threat of being jumped and incurring serious harm.

Moreover, House did sustain serious injuries as a result of his altercation with A.R., P.M., and D.J., including a fracture to his right eye socket, a skull fracture, and a nose fracture, necessitating a surgery in 2018.  Pl. House Tr. at 83–86, 92.  And, as House notes, courts in this District have held that sufficiently severe injuries may constitute *per se* showings of a sufficiently serious condition of confinement.  *See, e.g.*, *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221 (S.D.N.Y. 1995).

But those cases are inapposite here.  As the City points out, in each such case, the inmate was the victim of an undisputedly unprovoked attack.  *See id.* (inmate unexpectedly slashed across face, requiring 60 stitches to close); *Warren v. Goord*, 579 F. Supp. 2d 488, 491, 94 (S.D.N.Y. 2008) (inmate slashed across cheek with a razor while watching television); *Perez v. Ponte*, 236 F. Supp. 3d 590, 600, 625–26 (E.D.N.Y. 2017), *report and recommendation adopted*, No. 16 Civ. 645 (JFB) (AKT), 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017) (inmate slashed across face from behind).

By contrast, here, it is undisputed that the plaintiff, House, instigated the physical altercation.  House contends that he punched A.R. in an effort to protect himself because Seepaul was not at his post and A.R.'s comportment led him to suspect an imminent attack.  House Opp. at 24; Pl. House Tr at 47–48.  As House recounted at his deposition:  A.R. told him to "pack up" and "get out of here"; House at that point had the opportunity to walk away but did not do so; A.R. began "punching" his fists together; while House initially did not find this threatening, A.R. then "became aggressive" and began "coming towards [House] in an aggressive way," with "his fists bal[le]d," at which point House punched A.R. in, effectively, a preemptive strike.  *Id.* at 47–51.  P.M. and D.J. then assaulted House, an attack that lasted approximately 30 seconds.  JSF ¶¶ 6–7; VCBC Video.  The parties dispute whether House was justified in throwing the first

punch as a means of self-defense, or whether he was an unjustified aggressor. City Mem. at 14; House Opp. at 24; City Reply at 6–7.

In these circumstances, House's injuries, while relevant to the risk of harm, cannot be treated as *per se* proof that before the attack, he faced conditions posing a substantial risk of serious harm. That is because on one view of the facts, an attack would not have come about had House not thrown the first punch, hitting A.R. in the face. *See, e.g.*, *Louis-Charles v. Courtwright*, No. 9:11 Civ. 147 (GLS) (TWD), 2014 WL 457951, *6 (N.D.N.Y. Feb. 4, 2014) ("an inmate's own violent tendencies are not the type of 'substantial risk of serious harm' protected by the Constitution"); *see also Pecuch v. Platt*, No. 13 Civ. 6102 (FPG), 2015 WL 6505109, at *3 (W.D.N.Y. Oct. 27, 2015). But viewing the facts in the light most favorable to House as the non-movant, as the Court must, the inference is viable that, had he not thrown the first punch, House would still have been attacked and suffered comparable injuries within the period when Seepaul was away from his post. Notably too, the inmates who attacked House, P.M. and D.J., had not been struck by House. House struck A.R. who, House testified, had been "aggressively" advancing on him. A reasonable jury could view the other inmates' intercession as consistent with a preexisting intention to join A.R. in jumping House.

Considering the facts in the light most favorable to the non-movant, a reasonable jury could find that, shortly before the attack, House faced a meaningful risk of being jumped by hostile inmates and experiencing significant injures, and thus was confined in conditions which presented substantial risk of serious harm. The Court therefore cannot grant defendants' motions for summary judgment to the extent they are based on the objective prong. The Court accordingly turns to defendants' next argument—that the evidence would not permit a

reasonable jury to decide the subjective prong, focused on Seepaul's *mens rea*, in favor of House.

ii.     *Mens Rea* Prong: Requisite Culpability

To satisfy the *mens rea* prong of the deliberate indifference analysis, "the pretrial detainee must prove that the defendant-official acted intentionally . . . or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. The Second Circuit has recently clarified that, although this second prong has sometimes been called the "subjective prong," in the context of a pretrial detainee's challenge under the Due Process Clause of the Fourteenth Amendment, the *mens rea* prong (unlike in the context of a challenge under the Eighth Amendment) is objective in nature. *Id.* at 35–36. A detainee must demonstrate that the prison official acted purposefully or with an objectively reckless disregard of the risk to the inmate; mere negligence is insufficient. *Id.* at 36; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").

Here, House contends that Seepaul should have been aware of a generalized risk to his safety, like the risk inmates faced in *Ross*, 2014 WL 3844783. *See* House Opp. at 16–17. But that argument fails because, as discussed in connection with the objective prong, House has not adduced evidence to support that 2BB presented a generalized risk to inmate safety. The contrast with the prison in *Ross* is stark. There, despite being aware that his post was along a "maximum security cell block," "known to be populated by gang members," in which inmates "tend to fight whenever they feel like it," and that prisoners' cells had not been searched for weapons, *Ross*, 2014 WL 3844783, at *4, the correction officer abandoned his post without securing coverage.

*Id.* at \*5.  Leaving his post in such a fraught environment could be found, the district court, held, to reflect a reckless disregard for the generalized risk presented to all inmates.  *Id.*

To sustain his claim, House therefore must demonstrate that there is a genuine issue of material fact as to whether Seepaul, in leaving his post, recklessly disregarded a substantial risk specific to House.  The evidence is insufficient, however, to permit a reasonable jury to conclude that a reasonable officer in Seepaul's shoes would have appreciated a serious risk of substantial harm to House.  House has not adduced evidence remotely comparable to that in *Ross* on this point.

House's attempt to do so turns on the two complaints he claims to have made to Seepaul.  First, House testified that he told Seepaul approximately three weeks before the December 30, 2017 incident that he did not "feel comfortable" in 2BB and asked to be moved to either a different jail or dorm.  Defs. House Tr. at 26; Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35.  Although House's counsel now depicts his testimony as being that he told Seepaul at this time that someone was going to jump him and/or that his life or safety had been threatened, *see, e.g.*, House Opp. at 17–21, House's deposition testimony bears no resemblance to that portrait.[16]  Rather, at various points, House testified that he told Seepaul that he did not "feel comfortable in the house, and [he] wanted to move, either to a different jail or to a different location," or that he did not "feel safe."  Defs. House Tr. at 26–28; 45.  But House never testified that he then told Seepaul that someone had

---

[16] The City claims that House never testified that he feared for his life or safety or that he thought he was going to be jumped.  City Reply at 6.  Although House never testified that he specifically told Seepaul he was going to be jumped, he did testify to having told Seepaul someone was "after [him]" approximately three weeks before the assault.  Defs. House Tr. at 167.  Further, although House never testified to having told an officer his life was threatened or that he feared for his life, he did testify to having told Seepaul on December 30, 2017, that he did not "feel safe."  *Id.* at 28.

threatened him or was going to jump him.  At most, House testified that he had told Seepaul that someone was "after [him]."  *Id.* at 167.  But he did not testify that he feared for his life or safety at this time.

House testified that Seepaul replied that he had a "feeling" he knew who House was referring to.  *Id.* at 26.  Even accepting that testimony as true, it does not establish that Seepaul should have appreciated that there was a substantial risk to House's safety.  The exchange as recounted by House does not reveal the name of the person whom Seepaul ostensibly had in mind.  And House does not explain why this bare exchange bespeaks an appreciation on Seepaul's part that House was thereby in serious danger.  Notably, by his account, House did not report to Seepaul his verbal altercation with P.M. and has not adduced evidence that Seepaul knew of this altercation, Pl. House Tr. at 64, or of House's alleged report a week later— approximately two weeks before the assault—to the John Doe officer.  On the contrary, although House's brief claims that he reported a "threat" to Seepaul at the time he told Seepaul he did not "feel comfortable," in fact, when deposed, House identified the first indirect threat to him as having been made two weeks before the assault, a threat which he reported to the John Doe officer.  Defs. House Tr. at 25.  Even assuming that House had been threatened three weeks prior and reported this threat to Seepaul, this would still be insufficient.  A report that an inmate was "threatened by [a certain inmate] . . . and that he 'feared for his safety'" lacks the requisite detail to notify a corrections officer that an inmate faces a substantial risk of serious harm.  *Morgan v. Dzurenda*, 956 F.3d 84, 90 (2d Cir. 2020).[17]  House's exchange with Seepaul on or around

---

[17] Although *Morgan* involved a claim of deliberate indifference under the Eighth Amendment, the reasoning is equally applicable to a claim under the Fourteenth, as the Second Circuit concluded that the threat was insufficient to have put the officers on notice of a substantial threat. Actual knowledge was not at issue.

December 9, 2017—three weeks before the assault—thus falls far short of permitting an inference that Seepaul appreciated that House was in serious danger.

Second, House testified that after his conversation with E.S. at lunch on December 30, 2017, in which E.S. told House to "watch his back," House—at approximately 5:30 p.m., during Seepaul's rounds—told Seepaul that he did not "feel safe" in 2BB and wanted to be moved.  Pl. House Tr. at 28, 76.  When questioned whether he told Seepaul anything other than that he did not feel safe, House answered, "[t]hat's about it."  *Id.* at 28.  House testified that, in response, Seepaul laughed and said, "I don't know."  *Id.* at 28.

Even crediting House's account of this conversation and viewing it in conjunction with the earlier exchange, this exchange between House and Seepaul also falls far short of supporting a finding that a reasonable officer in Seepaul's position would have appreciated a substantial risk to House's safety.  The information known to Seepaul was highly limited.  There is no evidence that he was aware of House's altercation with P.M.  Seepaul's response that he had a "feeling" he might know to whom House was referring cannot so establish, except by speculation.  There is thus no basis on which to infer that Seepaul, before the attack, was aware of the context of House's spare complaints—a brewing hostility between P.M. and House.  House, notably, had not reported his verbal altercation with P.M.  *See Desulma v. City of New York*, No. 98 Civ. 2078 (RMB) (RLE), 2001 WL 798002, at *7 (S.D.N.Y. July 6, 2001) (corrections officer had "no reason to infer the existence of a threat of harm, much less a life-threatening danger," to inmate where there had not been any prior altercations, even where inmate had asked for protective measures).

And House's second statement to Seepaul—to the effect that he did not "feel safe" and wanted to be moved—was sparse.  It was devoid of any details that would give a reasonable

officer a non-speculative basis to perceive a serious risk to an inmate's safety.  It is fairly likened

to the general complaint found insufficient in *Haughton v. Clinton*, No. 15 Civ. 1160 (JPO),

2015 WL 9244398 (S.D.N.Y. Dec. 17, 2015).  There, an inmate's statement to his jailer that he

"feared for his safety" was held insufficient, without more, to sustain a deliberate indifference

claim.  *See id.* at *2.[18]  Notably, in speaking with Seepaul the day of the incident, House did not

relate the threat he had received from E.S.  Pl. House Tr. at 28, 76.  Indeed, House testified that

after following his discussion with E.S., he was "not really worried."  *Id.* at 24.

Also unsubstantiated is House's suggestion that Seepaul was aware of the problematic

dynamics between House and other inmates.  House notes that Seepaul made an effort to speak

to each inmate on his rounds each day.  House Opp. at 11; *see also* Radlin Decl., Ex. 2 ("Pl.

Seepaul Tr.") at 30 (testifying that Seepaul would ask inmates about how things were going,

their cases, and their families).  But House has not pointed to any evidence that these discussions

brought to the fore the deteriorating relations between House and other inmates.[19]

In the end, a responsible and diligent officer in Seepaul's shoes ought to have followed

up after hearing an inmate's general expression of concern about safety.  Were the governing

standard one of negligence, the outcome on defendants' motion for summary judgment might

well be different.  Indeed, Seepaul's departure from his station for approximately 15 minutes, to

---

[18] Although *Haughton* was decided before the Second Circuit's clarification in *Darnell* that the *mens rea* prong in cases brought under the Fourteenth Amendment utilizes an objective rather than a subjective standard for recklessness, the reasoning in the case would lead to the same conclusion if applied under the objective standard.

[19] Although not necessary to this decision, Seepaul's unrefuted testimony is that he intervened with dispatch once O'Neil notified him about the fight in 2BB.  Seepaul entered the housing area and ordered House, P.M., and D.J. to stop fighting.  Defs. Seepaul Tr. at 33–34, 47–48.  Seepaul gave two commands to the fighting inmates to "[g]et off" and "move" before he used mace, which caused P.M. and D.J. to comply.  Defs. House Tr. at 59–60.

use the restroom, was a knowing violation of DOC policy, Defs. Seepaul Tr. at 53–54, that itself was itself a separate form of negligence. But, presented only with an inmate's conclusory and unsubstantiated statement that he did not feel safe or that some might be "after" him, Seepaul was not objectively reckless in failing to appreciate, at the time, that there was a serious threat to House's safety, whether presented by P.M., D.J., A.R., or other inmates. *See, e.g.*, *Morgan*, 956 F.3d at 90 (general complaints to officer that inmate had been "threatened" by a certain inmate and "feared for his safety" were not sufficient to notify officers of substantial risk of harm); *Desulma*, 2001 WL 798002, at *7 (officer did not have requisite *mens rea* for deliberate indifference where inmate had requested protective measures and where officer had observed prior verbal altercations with attackers); *Shand v. Chapdelaine*, No. 3:19 Civ. 755 (CSH), 2019 WL 2302513, at *4 (D. Conn. May 30, 2019) (dismissing failure-to-protect claims against officers to whom inmate had reported that he "feared for his safety and his life is in danger," while sustaining claims against officers to whom inmate had reported numerous specific verbal and written threats that other inmates were "going to get him"); *Wilson v. Campbell*, No. 06 Civ. 175 (GLS) (RFT), 2008 WL 902187, at *5 (N.D.N.Y. Mar. 31, 2008) ("A general, conclusory statement that an inmate fears for his safety, without more, is insufficient information from which an inference can been drawn that such inmate's's safety is actually at risk."). Negligence in failing to stay with an inmate where the risk of harm to the inmate was not reasonably clear to the officer and where the officer's failure to act was—on the record before the Court—"an isolated omission" falls short of supporting the finding of recklessness necessary to establish deliberate indifference. *See Zimmerman v. Macomber*, No. 95 Civ. 882 (DAB), 2001 WL 946383, at *6 (S.D.N.Y. Aug. 21, 2001).

Accordingly, for this independent reason, summary judgment on House's failure-to-protect claim against Seepaul is warranted.

### iii.    Qualified Immunity

Even if House had shown a genuine dispute of material fact as to whether Seepaul had acted with deliberate indifference in abandoning his post, Seepaul would be entitled to qualified immunity.  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Even where a constitutional right is clearly established, summary judgment on a defendant's entitlement to qualified immunity is also appropriate where, "even though plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the action complained of, it was nonetheless 'objectively reasonable' for the defendant official 'to believe that his acts did not violate those rights.'" *Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir. 1995) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).  To be entitled to qualified immunity, "the defendant official must produce such uncontroverted facts that a jury—drawing all inferences favorable to plaintiff—would have to conclude it was objectively reasonable for defendant to believe his actions did not violate an established federally protected right." *Id.*

Here, it is undisputed that House had clearly delineated constitutional rights to be protected from "violence at the hands of other prisoners" and to have prison officials employ "reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 828, 832; *see also Liverpool v. Davis*, 442 F. Supp. 3d 714, 734 (S.D.N.Y. 2020).  But, for the same reasons that the evidence does not permit a finding in House's favor on the *mens rea* prong, it does not permit a finding that a prison official in Seepaul's situation would have appreciated that his

conduct in leaving his post for 15 minutes deprived House of his constitutional rights. While Seepaul's conduct breached his duty and is properly termed negligent, that infraction equally ran to the detriment of all inmates on Seepaul's watch. House, for the reasons reviewed above, has not adduced evidence that would have led an officer in Seepaul's circumstances to appreciate that he was thereby exposing House to a substantial risk of serious harm, so as to rise to the level of an infringement of his due process rights.

In opposing qualified immunity, House relies on the fact that Seepaul knew that leaving his post for any period of time without securing coverage violated DOC policy. Defs. 56.1 ¶ 40; Pl. Seepaul Tr. at 53–54.[20] House argues that Seepaul's knowledge of this precludes a finding of qualified immunity. House Opp. at 29. That is wrong. A finding that an official violated an administrative rule is not tantamount to appreciation that another person's constitutional rights were thereby violated. *See, e.g.*, *Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Drew v. Connolly*, 536 F. App'x 164, 165–66 (2d Cir. 2013) (summary order) (violation of "written Departmental policy" does not necessarily violate an individual's constitutional rights so as to the deprive officer of qualified immunity); *Cox v. Village of Pleasantville*, 271 F. Supp. 3d 591, 600 (S.D.N.Y. 2017) (failing to comply with policy not a *per se* violation as constitutional rights as "[i]nternal policy may very well go above-and-beyond the bare-minimum requirements imposed by law," and an officer is not "more or less liable based on his or her compliance with departmental policy"). And, in the

---

[20] In connection with this incident, Seepaul pled guilty to abandoning his post and to "efficient performance of duty." Defs. 56.1 ¶ 46; Pl. 56.1 ¶ 46. In his deposition, Seepaul admitted being aware that, in leaving his post uncovered, he was violating DOC regulations. Pl. Seepaul Tr. at 53–54.

specific context here of a violation of a regulation governing the conduct of jailers, House has

not cited any authority that a knowing violation of DOC policy, without more, establishes *per se*

that the offending officer knew or should have known his actions were unlawful or likely to lead

to the deprivation of an inmate's constitutional rights.  *See, e.g.*, *Holland v. City of New York*,

197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("An alleged violation of a prison policy, directive, or

regulation, in and of itself, does not give rise to a federal claim, because '[f]ederal constitutional

standards rather than state law define the requirements of procedural due process.'") (quoting

*Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990)) (alternations in original); *Lopez v.*

*Reynolds*, 998 F. Supp. 252, 259 (W.D.N.Y. 1997) ("A prison inmate does not have a viable

§ 1983 claim based solely on prison officials' failure to adhere to the requirements of prison

regulations, directives or policy statements."); *see also Chalco v. Belair*, No. 3:15 Civ. 340

(VLB), 2018 WL 5892655, at *6 (D. Conn. Nov. 9, 2018) (an internal police department policy

is "not a clearly established law" sufficient to deprive the officer of qualified immunity).

 Accordingly, Seepaul is entitled to qualified immunity.

###    *b.* Monell *Liability of the City*

 For the reasons reviewed above, House's § 1983 claim against the City fails because he

failed to exhaust administrative remedies and because its premise (that Seepaul violated House's

constitutional rights) is not supported by sufficient evidence.  But, even assuming that House's

claim against Seepaul of deliberate indifference to unconstitutional conditions of confinement

had survived summary judgment, and even if House had exhausted his administrative remedies,

summary judgment would still be warranted for the defense on House's attempt to extend

liability to the City under *Monell*.

 In his complaint, House alleges two theories of *Monell* liability against the City:

(1) failure to train; and (2) failure to discipline or supervise.  The Court examines each of these

theories in turn, finding as to each that House has failed to adduce admissible evidence sufficient to establish his claim.

i.      Failure to Train

"A plaintiff may plead a *Monell* claim based on a failure to train only by pleading that a City's 'failure to train its subordinates . . . is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.'" *Nelson v. City of New York*, No. 18 Civ. 4636 (PAE), 2019 WL 3779420, at *16 (S.D.N.Y. Aug. 9, 2019) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)); *see also Brandon*, 705 F. Supp. 2d at 277 (*Monell* liability can be predicated on a "failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference"). Deliberate indifference in the context of a failure-to-train theory requires the plaintiff to "submit evidence that defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights." *Nelson*, 2019 WL 3779420, at *16 (quoting *Reynolds*, 506 F.3d at 192).

Here, the City argues House did not adequately plead this claim. City Mem. at 15–16. The City, however, did not move to dismiss, and the issue at this stage is therefore whether House has come forward with evidence sufficient to substantiate that claim.

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train*." Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotations and citations omitted). House has not adduced any evidence of such a pattern. House instead asserts that Seepaul was "not trained as

38

to situations regarding [protective custody] with inmates," a lapse which, House argues, a jury could find directly caused House's constitutional injury.  House Opp. at 22.

House's attempt to thus ground his *Monell* claim fails for three reasons.  First, factually House mischaracterizes Seepaul's testimony.  Seepaul testified that although he did not receive formal training at the CO Academy on protective custody, it was "fair to [s]ay that [he] received some training" as to this subject, whether at the CO Academy or on the job.  Pl. Seepaul Tr. at 57–58.  Second, House's premise for focusing on this species of training is faulty.  There is no evidence that House ever requested protective custody.  *See* Defs. House Tr. at 68.  And the cursory and general concern about safety that House articulated to Seepaul was far from that necessary to put an officer on notice of a need to place House in special custody.  Third, insofar as House suggests a deficiency in the City's training of correction officers with respect to defusing conflict among inmates, House has not adduced any competent evidence of deficient training in that area.

To be sure, in narrow circumstances, a single incident of failure to train an official can be sufficient to show deliberate indifference.  *Connick*, 562, U.S. at 64.  But that theory of *Monell* liability is sustainable only where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under [Section] 1983 without proof of a pre-existing pattern of violations."  *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 253 (E.D.N.Y. 2014) (quoting *Connick*, 562 U.S. at 64).  Courts in this Circuit and others have found that the single-incident theory is available only when the evidence reflects a complete lack of any training or where the training is so inadequate that it amounts to a "lack of training."  *Id.* at 254–55 (collecting cases).  House has not come forward with any evidence on which a jury could make such a finding.  On the contrary, Seepaul testified to having received "some training" and that he understood that if

an inmate had requested protective custody, he was to "notify [his] immediate supervisor." Pl. Seepaul Tr. at 58.

House's *Monell* theory, to the extent based on deficient training, therefore fails.

ii.    Failure to Supervise or Discipline

A plaintiff may also hold a municipality liable for "a persistent failure" to discipline or supervise its officials, because "such a pattern 'could give rise to an inference of unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*.'" *Nelson*, 2019 WL 3779420, at *16 (quoting *Batista v. Rodriguez*, 702 F.2d 393, 399 (2d Cir. 1983)). The Supreme Court, however, has imposed "stringent causation and culpability requirements" to establish liability based on such a theory, holding that the requirements set out in *City of Canton v. Harris*, 489 U.S. 378, 387 (1989), a failure-to-train case, equally apply to "failure-to-supervise and failure-to-discipline claims." *Calderon*, 138 F. Supp. 3d at 614 (quoting *Reynolds*, 506 F.3d at 192). In *City of Canton*, the Supreme Court held that the city's failure to train an officer constitutes a municipal policy only where the failure to act has caused the constitutional harm and "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (quoting *City of Canton*, 489 U.S. at 387).

House falls far short of satisfying this standard. He does not offer any evidence of a persistent failure to supervise or discipline officers for failure to protect inmates. Nor can House argue that Seepaul was not disciplined. On the contrary, as House acknowledges, Seepaul, as a result of his abandoning his post without securing coverage, was charged with and pled guilty to charges of abandonment of post and "efficient performance of duties." Pl. 56.1. ¶ 46; Defs.

40

Reply 56.1 ¶ 46.  As punishment, Seepaul received a command discipline and lost one vacation

day.  Pl. 56.1 ¶¶ 46–47; Defs. Reply 56.1 ¶¶ 46–47.

House instead seizes on Seepaul's prior disciplinary history to argue that the City should

have been aware that Seepaul was apt to violate detainees due process rights.  House Opp. at 22–23.

The evidence that House musters towards that end, however, is unequal to the task.  ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████  House has not identified any substantiated

complaint regarding a failure by Seepaul to protect an inmate from potential harm.  To the extent

a viable *Monell* claim theoretically could be brought against the City based on its persistent

failure to discipline a prison official on whose watch an inmate-on-inmate attack occurred, the

evidence here falls far short.  Seepaul's disciplinary history would not have put the City on

sufficient notice to make it obvious that Seepaul would likely act in the future with deliberate

indifference to a substantial risk of serious harm to an inmate such as House.  *See Stern v. City of*

*New York*, No. 12 Civ. 5210 (NGG) (RER), 2015 WL 3827653, at *8 (E.D.N.Y. June 19, 2015)

(dismissing failure-to-supervise claim where officer's disciplinary history did not contain any

similar incidents to the one suffered by plaintiff).

Summary judgment is therefore warranted for the City on House's *Monell* claim.

### 3.    Conspiracy Claim

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or

more state actors or between a state actor and a private entity; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

*Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  A plaintiff may make this showing

"through 'either direct or circumstantial evidence.'"  *Randle v. Alexander*, 170 F. Supp. 3d 580,

591 (S.D.N.Y. 2016) (alternations omitted) (quoting *Stein v. Janos*, 269 F. Supp. 2d 256, 261 (S.D.N.Y. 2003)).  "To survive a motion for summary judgment, plaintiff's evidence of a Section 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Stein*, 269 F. Supp. 2d at 261–62 (internal quotations and citations omitted).

In the Amended Complaint, House alleged that Seepaul and the John Doe officer had conspired to "cover[] up the actions of each other."  Am. Compl. ¶ 28.  Summary judgment is warranted for the defense on this claim, for two reasons.

First, with discovery complete, House has not identified the John Doe officer, or adduced any evidence of a conspiracy—or even any relevant dealings—between Seepaul and that person. Second, House did not address that claim in his brief opposing Seepaul's motion for summary judgment, *see* Seepaul Mem. at 4–5; *see generally* House Opp., and therefore has abandoned that claim, *see Jackson*, 766 F.3d at 195, 197–98 (partial response to summary judgment motions that mentioned some claims and not others may constitute abandonment of the unmentioned claims); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

### D.    State Law Claims

House also brings state-law claims against the City under theories of negligent hiring, retention, and supervision, and *respondeat superior*.  Am. Compl. ¶¶ 30–37; House Opp. at 25–26.

Where summary judgment has been entered for the defense on a plaintiff's federal claims, the Court has the discretion to elect no longer to exercise supplemental jurisdiction over pendent state law claims as to which there is no independent basis for federal jurisdiction.  *See* 28 U.S.C. § 1367(c).  In such cases, the "basis for retaining jurisdiction [over the state law

claims] is weak." *Baylis v. Marriott Corp.*, 843 F.2d 658, 664 (2d Cir. 1988).  But, where, as here, the state law claims arise from a common nucleus of operative facts, discovery is complete, and there are no novel or unresolved questions of state law, a federal court may, in the service of the "values of judicial economy, convenience, fairness, and comity," exercise supplemental jurisdiction to decide the remaining state law claims.  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Here, because the Court finds that House's state law claims are "easily rejected on well-established principles," deciding these claims in this Court "will save future, needless litigation in state court*." Morales v. City of New York*, 59 F. Supp. 3d 573, 583 (S.D.N.Y. 2014) (internal quotations and citations omitted).

In general, under New York law, a plaintiff cannot succeed on both a claim for negligent hiring, training, and retention and a theory of *respondeat superior* because the former requires that an employee acted outside the scope of his employment, while the latter requires that an employee acted within the scope of his employment.  *See Rowley v. City of New York*, No. 00 Civ. 1793 (DAB), 2005 WL 2429514, at *12 (S.D.N.Y. Sept. 30, 2005).[21]  Whether an employee was acting within the scope of his employment "depends heavily on the facts and circumstances of the particular case, and thus is appropriate for a jury."  *Rowley*, 2005 WL 2429514, at *13.  The City does not concede that Seepaul was acting within the scope of his employment, *see* Seepaul Answer ¶ 38; City Cross-Claims Answer ¶ 2, and neither party has

---

[21] Some New York courts have recognized a limited exception where a plaintiff seeks punitive damages from the employer based on gross negligence in hiring or retaining the employee.  *See, e.g.*, *Karoon v. N.Y.C. Transit Auth.*, 241 A.D.2d 323, 324 (1st Dep't 1997).  Although the Complaint does seek punitive damages, House has not adduced evidence of gross negligence here.

offered admissible evidence or argument on this point.  The Court, however, need not resolve whether Seepaul was acting within the scope of his employment because House has not adduced sufficient evidence to establish all remaining elements of either claim.  Accordingly, summary judgment is warranted for the City on both state claims.[22]

### 1.    Negligent Hiring, Retention, Supervision, and Training

Under New York law, to succeed on a claim for negligent hiring, retention, or supervision, a plaintiff must show that the "employee committed an independent act of negligence outside the scope of employment, where the [employer] was aware of, or reasonably should have foreseen, the employee's propensity to commit such an act."  *Seiden v. Sonstein*, 127 A.D.3d 1158, 1160–61 (2d Dep't 2015); *see also Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (negligent hiring, retention, or supervision theory requires that the employer "knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence") (internal citation or quotations omitted).  Although the municipality, "[h]aving assumed physical custody of inmates, . . . owes a duty of care to safeguard inmates, even from attacks by fellow inmates, . . . this duty does not render the municipality an insurer of inmate safety, and negligence cannot be established by the mere occurrence of an inmate assault."  *Barnette v. City of New York*, 96 A.D.3d 700, 701 (2d Dep't 2012) (quoting *Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002)).  Liability is still limited to "risks of harm that are reasonably foreseeable," including both "what the City defendants actually knew and what the City defendants should have known."  *Id.*

---

[22] The City raises additional defenses to House's state law claims: that (1) House's Notice of Claim was deficient; (2) House has not complied with the requirement for a hearing under Gen. Mun. Law § 50-h; and (3) the City is entitled to immunity.  *See* City Reply at 14.  Because the Court finds insufficient evidence to establish the elements of these claims, there is no occasion to consider these defenses.

House's sole argument that the City reasonably should have been aware of Seepaul's alleged propensity to fail to protect inmates is Seepaul's prior disciplinary record.  House Opp. at 25.  However, this argument fails for the same reason House's federal failure-to-discipline claim fails:  Seepaul's prior disciplinary record, █████ ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ does not contain any substantiated failure-to-protect complaints that would have put the City on notice of Seepaul's alleged propensity to fail to protect inmates.  Consequently, House's negligent hiring, retention, or supervision claim fails regardless of whether Seepaul acted within the scope of his employment.  Because House cannot show that the City was aware that Seepaul had a propensity for failing to protect inmates, his negligent hiring claim must be dismissed.  *See, e.g.*, *Pinkney v. City of New York*, 52 A.D.3d 242, 243 (2008) (negligent hiring, retention, training or supervision claim must be dismissed where there is an "absence of evidence that it knew or should have known of any propensity" by the officer to commit the negligent act); *Barnette*, 96 A.D.3d at 701 (dismissing negligent supervision claim where plaintiff had neither actual nor constructive notice of risk of assault on plaintiff).

### 2.     *Respondeat Superior*

Under the doctrine of *respondeat superior*, an "employer may be liable when [its] employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment," and the employee is acting in the scope of his employment.  *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999).

House conclusorily states that Seepaul "was acting in the scope of his employment, and it was foreseeable that [the City's] employee would have acted in this matter breaching his duty to plaintiff."  House Opp. at 26.  Although House does not cite any admissible evidence in support

of this claim, assuming that House is referring to Seepaul's disciplinary record, this argument fails for the same reasons House's federal failure-to-discipline and state negligent hiring, retention, and supervision claims fail.  These unrelated disciplinary actions would not put the City on reasonable notice that Seepaul may momentarily abandon his post and fail to protect an inmate, and therefore his actions were not foreseeable.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motions for summary judgment. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 75 and 84 and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: November 24, 2020
         New York, New York